IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HAMANI NOWLEN and HAROLD        )
LATHAN                          )
              Plaintiffs,       )
                                )   Civil No. 03-1157-AS
          v.                    )
                                )   OPINION AND ORDER
FERALLOY OREGON CORPORATION,    )
OREGON STEEL MILLS PROCESSING,  )
INC., and OREGON FERALLOY       )
PARTNERS,                       )
                                )
              Defendants.       )
_____)

ASHMANSKAS, Magistrate Judge:

**OVERVIEW**

Hamani Nowlen (Nowlen) and Harold Lathan (Lathan) filed a

complaint against their former employer, Oregon Feralloy

Partners[1] alleging three claims: (1) race discrimination under

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

_____

    [1]   Oregon Feralloy Partners was created by agreement in a
joint venture between Oregon Steel Mills Process, Inc., and
Feralloy Oregon Corporation, the other two named defendants in
this action.  Defendants will be referred to collectively as OFP.

U.S.C. § 2000e; (2) race discrimination under 42 U.S.C. § 1981;
and (3) intentional infliction of emotional distress.  Regarding
the first two claims, Nowlen and Lathan allege that OFP acted
unlawfully by: (1) refusing to promote them; (2) retaliating
(termination) against them for complaining about racial
discrimination; and (3) creating a hostile working environment.
Regarding the third claim for intentional infliction of emotional
distress (IIED), Nowlen and Lathan allege that OFP's conduct was
reckless and intended to inflict severe mental and emotional
distress.  OFP filed a Motion for Summary Judgment against all
claims.  Oral argument was heard and for the reasons that follow,
OFP's motion is granted, in part, and denied, in part.

### STATEMENT OF FACTS

Nowlen and Lathan are African American.  OFP General
Manager, Paul Abernathy, made the decision to hire Nowlen.
Likewise, Abernathy interviewed and hired Lathan on June 18,
2001; Abernathy also made the decision to terminate Lathan about
fifteen months later.  Nowlen and Lathan lacked previous
experience in the steel processing industry when OFP hired them.
Nowlen and Lathan's initial wage was $11 per hour, which is
equivalent to the wage paid to other new hires around the same
time who lacked steel processing experience.

Throughout most of their employment, Nowlen and Lathan
worked in the stacker area and reported to Steve Kugler, the
production supervisor, who, in turn, reported to Abernathy.

Lathan applied for two promotions during his employment with OFP and he was awarded promotions over other applicants.

Both Kugler and Abernathy praised Nowlen's work performance, and other employees perceived that OFP management believed that Nowlen was skilled. Despite repeated encouragement from Kugler to apply for a promotion, and despite his familiarity with the promotion process, Nowlen never bid on any job opening, nor did he complain to management about any perceived barriers to his potential for promotion.

Neither Nowlen or Lathan alleges that any OFP manager engaged in inappropriate behavior, with the exception of a single comment concerning race that was made to Lathan by a supervisor, Rick Lampe. Specifically, when Lathan was eating chicken, Lampe stated, "You black guys sure like that chicken and watermelon." Lathan complained to Abernathy about Lampe's comment and Abernathy spoke to Lampe the next day. Lampe never made another comment to Lathan that Lathan viewed as inappropriate or offensive. Neither Lathan or Nowlen identify any other racial comments by Lampe to anyone else at OFP after this matter.

Lathan also complained to Kugler about a comment made by a coworker, Juan Salinas, who was a crane operator. Lathan testified, "When you're a crane operator, you have someone that follows you around to place boards underneath the steel –- it's called a rigger –- and there was one lady there that did that position, but at times, they would have James to do that job, and

then I guess Juan thought that I wasn't going to make it on the stacker.  He goes, 'You're going to be my Kunta Kinte.'" Although Lathan claims that Salinas continued to make racially offensive remarks to him, he never reported to OFP that Salinas' behavior was an ongoing problem.

While Nowlen never raised any concern with OFP about racially inappropriate remarks or conduct directed toward him, he did report the use of a racial slur by a Caucasian coworker, Troy Jones.  Nowlen was not present when the slur was used, but the target of the slur, James McRae testified as follows:

> During the time I worked at OFP, I only heard a racial slur used on one occasion.  Another employee working in the stacker, Troy Jones, referred to me as a nigger after I flicked a cigarette at him when we were horsing around.  I did not report it to OFP management, and to my knowledge OFP management did not witness the incident.  I never heard any other employee use racial language with me or anyone else.  Since the incident, I have become good friends with Troy Jones.

Nowlen testified that Lathan told him about the incident the next day; and, Nowlen reported it to Steve Kugler.  After Abernathy learned of the remark, he warned Jones that any further inappropriate comments would result in termination, and recorded the warning in Jones personnel file.

OFP maintains and posts an anti-discrimination policy that directs employees to report harassment or discrimination to their supervisor, their department head or an off-site Human Resources manager.  Nowlen and Lathan also could have raised any concerns anonymously through their elected employee representatives.

Neither Nowlen or Lathan ever complained to an employee representative, and no employee representative reported any concern or discrimination or harassment of OFP management during the period Nowlen and Lathan worked at OFP.

During discovery, Nowlen and Lathan produced a letter dated August 13, 2002, and addressed to Abernathy regarding incidents of racial harassment and discrimination that Lathan allegedly experienced while working at OFP. Lathan, however, never provided this letter to Abernathy. After Lathan wrote the letter and provided it to a counselor who he knew at Northeast Workforce Center, he decided that he wanted to remain anonymous and thus chose not to pursue the matter.

Nowlen and Lathan allege that racial animus was directed at them and other African American workers on many occasions. The alleged conduct includes racial slurs, abusive language, disparate treatment when the production line broke down and disparate disciplinary measures. Nowlen and Lathan also allege that a hangman's noose hung at a job station and that a coworker taunted them with a noose-like rope. Lathan testified that he saw a green noose tied to the temper mill, but that he did not report that. Nowlen testified that he saw a brown noose hanging in the work area, but did not report it to management. McRae, who worked alongside Nowlen and Lathan had no knowledge of any noose. However, another African American employee at OFP, Hill, acknowledges that she once saw a coworker joking around with a

noose, but states that the comment he made, which she viewed as a joke, was that the noose was intended for Abernathy due to the long hours that OFP employees were working. She does not recall any display of or reference to the rope that could be perceived as threatening or intimidating to African American employees.

Lathan alleges that Abernathy hit Lathan's hardhat with a clipboard. In his deposition, Lathan testified about the incident as follows:

> Q. Do you recall what Mr. Abernathy was mad about?
>
> A. Yes, I remember that day quite clearly. We were working that day, and we were running steel, and they were having problems with the conveyor belt that held the steel that came to the last place.
>
> Q. Do you recall that the problem was that you're supposed to run these conveyor belts in tandem and people weren't running them in tandem?
>
> A. Correct.
>
> Q. And it was causing it to break?
>
> A. Correct.
>
> . . . . .
>
> Q. Were you one of the people responsible for running the conveyor on the shift that day?
>
> A. One of the people, correct.
>
> . . . . .
>
> A. . . . . It was break time at that time so we went and took our breaks. Paul [Abernathy] gathered everybody around the stacker and he discussed how the machine, the belts, should be working. After he discussed how the machine broke down and how it should be working, he took his clipboard and slammed me over the head with it.

. . . . .

A.    . . . There was a slam of the clipboard to my head, and
I went blurry, I got dizzy, I was shocked, I was angry,
I was frustrated, and I was confused.  Why did this man
hit me with this clipboard?  You don't put your hands
on me.  You don't hit me.  You explain what you need
explained and let it be at that.  It's not necessary to
use a clipboard to hit me on the head.  What's the
point of that?

Q.    You're saying he hit you with such force you got dizzy?

A.    I blacked out, got blurry, everything stopped, got real
silent, then I came to.  That's exactly how I felt.

Q.    So you fainted to the floor?

A.    I held my ground and took it in.  I took it, and I
didn't retaliate.

Q.    Okay.  But you had a blackout moment while you were
standing?

A.    I blacked out, I literally blacked out, and I shook,
everything got dizzy, everything got foggy, everything
got blurry.

Nowlen and Lathan allege generally that whites were treated

differently from blacks at OFP.  For example, Charles Bryant, an

employee of Oregon Steel Mills who would visit OFP daily as part

of his job, testified that on at least five occasions he

witnessed the conduct of the workers during "downtime" on the

line at OFP.  During downtime, Bryant observed that many of the

white workers were permitted to take extended breaks on the dock,

while the African American workers were required to continued

working around the production line wiping down machinery, seeping

and cleaning up under the line.  Bryant further testified as

follows:

On one occasion, I referred to the African-American co-workers working, while the white co-workers rested and smoked to a white lead operator, who I believe to be Steve Kugler. I said: "is this really as bad as it looks? Why is it every time I come over here and the line is down, the brothers are all working and the whites are all sitting around on their []?", or words to that effect. He stared at me and offered no reply. Thereafter I made mention of these facts to those present, every time I saw the line down, with words to the effect of "Same old [] happening" to anyone who would listen at the scene.

A few months after he was hired, management met with Lathan to discuss his work performance, after two performance reviews had demonstrated that Lathan was making significant performance errors. Lathan acknowledged that he needed additional computer training, and in response Abernathy assigned another employee to provide Lathan one-on-one computer training for one week. Lathan also acknowledged to Nowlen that Lathan was having difficulty performing his job. Kugler repeatedly pressured Abernathy to terminate Lathan due to his poor work performance, but Abernathy tried instead to improve Lathan's performance. In September 2002, Lathan's employment was terminated by OFP.

It was understood by Nowlen's coworkers that he planned to resign at the end of September 2002, to return to school and to start a musical career. In September 2002, Nowlen stopped coming to work at OFP.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The materiality of a fact is determined by the substantive law on the issue.  T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  Id. at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  T.W. Electrical, 809 F.2d at 630.

### DISCUSSION

Nowlen and Lathan allege claims for race-based discrimination, retaliation and hostile work environment, as well as a claim for IIED.  In both their first (Title VII) and second

(section 1981) claims for relief, Nowlen and Lathan allege that OFP discriminated against them "either by refusing to promote [them], by refusing to properly pay [them] because of their race and color; by subjecting [them] to a hostile work environment based on race and color and by retaliating against [them] . . . because of their complaints about said discrimination."[2]  In their third claim for relief, Nowlen and Lathan allege OFP's acts and omissions "constitute[d] an extraordinary transgression of the bounds of socially tolerable conduct."  The court will consider each of these claims to determine whether, on the record before it, summary judgment is appropriate.

## I.  Discrimination and Retaliation - Disparate Treatment

### A.  *Prima Facie* Case

#### 1.  Legal Standard

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to

---

[2] Based on the court's careful reading of Nowlen and Lathan's pleadings, including their First Amended Complaint and their Memorandum in Opposition to Defendants' Motion for Summary Judgment, the court has determined that their case is framed as follows:  Nowlen and Lathan both allege claims under Title VII and section 1981 for (1) discrimination grounded in a failure to promote them; (2) retaliation grounded in their termination from employment; and (3) hostile work environment grounded in the working conditions at OFP.  In addition, Nowlen and Lathan allege a claim for IIED arising from the circumstances of their employment at OFP.  While there are many other allegations of misconduct by OFP, the court was unable to discern under what framework Nowlen and Lathan sought consideration of those other allegations.  Nowlen and Lathan may seek leave of the court to file a second amended complaint to seek redress under additional theories.

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Additionally, section 1981 provides relief for race-based discrimination. To prevail in a Title VII claim or section 1981[3], an employee must establish a *prima facie* case of <u>discrimination</u>. Unlawful discrimination is presumed if plaintiff can show that (1) he belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) other employees with qualifications similar to his were treated more favorably. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).

To make out a *prima facie* case of <u>retaliation</u> under Title VII ("opposition clause" of 42 U.S.C. § 2000e-3(a)) or section 1981, an employee must establish that : (1) he engaged in protected activity, such as filing of a complaint alleging racial discrimination; (2) the employer subjected him to adverse employment action; and (3) a casual link exists between the

---

[3] To establish a claim under section 1981 plaintiff must prove that he or she was subjected to intentional discrimination based upon his or her race, rather than solely on the basis of the place or nation of their origin or their religion. A plaintiff may seek relief under both Title VII and section 1981 for racial discrimination in employment. <u>Jurado v. Eleven-Fifty Corp.</u>, 813 F.2d 1406, 1412 (9th Cir. 1987). The same standards apply, and facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim. <u>Id</u>.

protected activity and the adverse action.  Manatt v. Bank of
America, NA, 339 F.3d 792, 798 (9th Cir. 2003).

2.   Discrimination Analysis

OFP charges that neither Nowlen or Lathan can satisfy their
*prima facie* case of discrimination because they were not
subjected to an adverse employment action; namely, the failure to
promote.  To establish a prima facie case for failure to promote
due to racial discrimination, Nowlen and Lathan must demonstrate
that: (1) he is a member of a protected class; (2) he applied for
and was qualified for an open job; (3) he was rejected for that
job; and (4) rather than filing the position the employer left it
open or filled it with a Caucasian worker.  McGinest v. GTE
Service Corp., 360 F.3d 1103, 1122-1123 (9th Cir. 2004).  Nowlen
and Lathan must also offer evidence that OFP's failure to promote
them was due in part or whole to discriminatory intent.  Id. at
1122.

The court turns first to Nowlen's claim for discrimination
based on a failure to promote.  OFP maintains, and Nowlen does
not dispute, that Nowlen never applied for a promotion and Lathan
was awarded both of the promotions for which he applied.  In
fact, Nowlen concedes the following:

> Both Kugler and Abernathy praised Nowlen's work performance,
> and other employees perceived that OFP management believed
> that Nowlen was skilled.  Despite repeated encouragement
> from Kugler to apply for a promotion, and despite his
> familiarity with the promotion process, Nowlen never bid on
> any job opening, nor did he complain to management about any
> perceived barriers to his potential for promotion.

Nor does Nowlen dispute OFP's assertion that he never applied for a promotion, in his response to OFP's request for summary judgment on this question. Thus, it is undisputed that Nowlen never applied for a promotion and, therefore, is unable to make his *prima facie* case of discrimination based on a failure to promote. Accordingly, summary judgment is granted against Nowlen's claim for discrimination, under both Title VII and section 1981, based on failure to promote.

Next, the court considers Lathan's claim for discrimination based on a failure to promote. It is undisputed that Lathan received both promotions for which he applied and then voluntarily resigned both of the positions he was awarded. Nevertheless, Lathan asserts a discrimination claim on the ground that he was "discouraged from trying to keep the promotion." Lathan's testimony is as follows:

> Q. So you received the only two positions that you ever applied for?
>
> A. I never received those positions.
>
> Q. You were awarded those positions as a result of the job-bid process?
>
> A. I was awarded them, but I never worked those positions. I never received that pay, and that was entitled to be my new job. I never --
>
> Q. You resigned both opportunities, correct?
>
> A. Correct.

Lathan does not cite any case law to support a claim for failure to promote when the employee has in fact received both

promotions for which he applied.  On its face, Lathan is unable
to satisfy either the third or fourth elements of his *prima facie*
case for failure to promote claim.  Rather, it seems that
Lathan's only argument under the circumstances is that after
having received the promotions for which he applied he was
constructively discharged by the actions of his employer.

To establish "constructive discharge," plaintiff must show
that the abusive working environment became so intolerable that
his resignation qualified as a fitting response.  <u>See</u>, <u>e.g.</u>,
<u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 124 S.Ct.
2342, 2351 (2004)("The inquiry is objective: Did working
conditions become so intolerable that a reasonable person in the
employee's position would have felt compelled to resign?").

Based on the record as a whole, Lathan alleges the following
evidence to show that OFP subjected him to a constructive
discharge:

- Lampe, Lathan's supervisor, made discouraging comments
  regarding his application for a Quality Assurance (QA)
  position at OFP.

- Lampe said to Lathan:  "You might as well renege.  You
  might as well write a letter to resign to Paul.  Other
  people do it, you might as well do it and not take this
  job.  You're not capable of learning this job."

- Lathan also received some discouraging comments from a
  white coworker about Lathan's QA bid;

- Lathan complained about coworkers "speeding up the
  line" and making it impossible to do his job properly;

- In most instances at OFP, the person awarded the job is
  the one who is "specifically trained for that

position".  Lathan was not trained for the temper mill job after it was awarded to him;

- Lathan quit the temper mill position because OFP would not train him.  When Lathan arrived for training for the job, Richard Lampe, Sr., was instead being trained for that job by Abernathy.  Lampe Sr. is white and is the father of Lathan's former supervisor.;

- When Lathan told Kugler that he wanted "a different position or better pay" Kugler responded:  "Be grateful and thankful for where you're at and what you got.";

Viewing this evidence in the light most favorable to Lathan, the court finds that it does not meet the requirements of constructive discharge as a matter of law.  Only an unreasonably sensitive employee would feel compelled to resign because they received some discouraging comments, experienced a coworker trying to make their job more difficult, or perceived that someone else was also being trained for their position.  While these circumstances may be undesirable, or cause frustration, they are far from intolerable.  See, e.g., King v. AC&R Advertising, 65 F.3d 764, 767-768 (9th Cir. 1995)(Plaintiff must show acts leading to constructive discharge are extraordinary and egregious to defeat summary judgment.).

In addition, there is no evidence that Lathan reported any of his concerns to OFP management.  At the time he resigned the temper mill position, Lathan did not mention to OFP management that he believed he was not being adequately trained; or that he was competing with Lampe Sr. for the same position.  Nor did Lathan ever report to OFP management that one of his coworkers

allegedly "sped up the [production] line to make his duties more difficult."

Conversely, there is no evidence that OFP management did not intend to train Lathan for the temper mill position, or replace him with Lampe Sr., or demote him because he was not keeping pace with the QA duties. Rather, the evidence shows only that Lathan received and then voluntarily resigned, albeit under difficult conditions, the two promotions.

Finally, even if Lathan could establish the third element of a failure to promote claim, he was rejected for the job, he is unable to show the fourth element, OFP filled the job with a non-minority. The only evidence in the record is that Lampe Sr. was being trained for a temper mill position at the same time as Lathan. In his deposition, Lathan testified that:

A. Yes, Okay, well, the job was awarded to me because of my seniority, but when I went to train for that job, there was always Richard Lampe [Sr.] there being trained by Paul in the mornings when I got there, so I felt personally that I wasn't being trained for the job. Paul was always training Richard Lampe [Sr.]

. . . .

Q. You never complained to Mr. Abernathy that you weren't getting adequate training, did you?

A. No, I just sat there and watched, stood back and watched.

. . . .

Q. Okay. Now, when you told Mr. Abernathy that you did not want to take this job, did you tell him that the reason you didn't want to take it was inadequate training, or did you just say, "I don't want to take this job?"

A.   To the best of my recollection, I think I told him I
             didn't want to take the job, I would just be more
             comfortable at the stacker.

     There is no evidence in the record that either of Lathan's
positions were given to non-minority employees.  Rather, the
evidence shows that Lathan resigned the QA position because he
"want[ed] to be on a job where [he could] excel."  The record is
completely silent on Lathan's replacement for the QA position
that he voluntarily vacated.  Similarly, Lathan resigned the
temper mill position because he "would just be more comfortable
at the stacker."  Moreover, Lathan's assumption that Lampe Sr.
was training in the temper mill position in his place is not
supported by the record as a whole.

     Based on the record before the court, the court finds that
Lathan did not suffer an adverse employment action by OFP; there
was no failure to promote as he received both promotions for
which he applied; and there is insufficient evidence, as a matter
of law, to support a theory of constructive discharge in place of
Lathan's voluntary resignation from either the QA or temper mill
positions.  Summary judgment is granted against Lathan's claim
for discrimination, under both Title VII and section 1981, for a
failure to promote.

           3.   Retaliation Analysis

     Similarly, OFP maintains that neither Nowlen or Lathan can
satisfy their *prima facie* case of retaliation because they fail
on all three prongs, i.e., reporting protected activity,

suffering a retaliatory act by OFP and, establishing a causal link between any complaint by Nowlen or Lathan and their respective terminations.

Nowlen and Lathan respond that OFP terminated them after they complained of racial slurs, abusive language, disparate treatment when the line broke down, an assault on Lathan by Abernathy, disparate training for jobs and disparate disciplinary measures. According to plaintiffs, Nowlen was told to quit by his psychiatrist due to the stress and anxiety caused by such a hostile work environment; and, Lathan was fired allegedly for failing to complete a computer course, which was self-paced and had no deadline for completion. Lathan claims his termination was pretextual. Plaintiffs rely on the time promixty between their complaints and their termination to show the required causal link. <u>See</u>, <u>e.g.</u>, <u>Ray v. Henderson</u>, 217 F.3d 1234, 1244 (9th Cir. 2000)(Court may infer causal link from the "proximity in time between the protected actions and the allegedly retaliatory employment decision.").

The court considers first Nowlen's claim for retaliation. The undisputed evidence in the record shows that Nowlen never raised directly a concern with OFP about racially inappropriate remarks or conduct directed toward him by management or coworkers. Nor is there any evidence that Nowlen ever complained directly to OFP about disparate treatment suffered by himself or other African American workers. On the single occasion that

Nowlen complained to OFP about racial animus, the matter involved two coworkers, Jones (Caucasian) and McRae (African American). Once OFP management (Abernathy) learned of the remark, Jones was warned that any further inappropriate comments would result in termination, and Abernathy recorded the warning in Jones' personnel file.  Nowlen concedes that OFP was responsive to his complaint.

This isolated reporting event occurred five months prior to Nowlen's departure from OFP.  While the events leading to Nowlen's departure from OFP are in dispute, there is no evidence that OFP terminated Nowlen.  Rather, the evidence shows that Nowlen left voluntarily -- whether it was on the advice of his psychiatrist or in order to return to school.  The evidence is as follows:

> Q.   And do you recall what your last day of work is?  Is it September 14th, 2002?  If you look at Exhibit 47, that's a leave of absence form requesting a leave of absence.
>
> A.   Yes, that's the date.
>
> Q.   So it would be accurate to say that on September 14, 2002, you stopped reporting to work?
>
> A.   Yes

Nor does Nowlen allege or set forth any evidence or argument to support a claim for constructive discharge.

Finally, Nowlen is unable to show a causal link between the protected activity and the adverse employment action.  The sum of the evidence is that in March 2002, Nowlen complained to

management about one incident of racial animus, Nowlen concedes that OFP responded in an appropriate manner, and in September 2002, Nowlen voluntarily stopped coming to work and was then terminated.

Thus, while it appears that Nowlen is able to satisfy the first prong of a retaliation claim (protected activity), he fails to meet his *prima facie* burden on either the second (adverse employment action) or third prongs (causal link) as a matter of law. Summary judgment be granted against Nowlen's claim for retaliation under both Title VII and section 1981.

Turning to Lathan's claim for retaliation. The court is satisfied that Lathan engaged in protected activity when he complained of racial animus by Lampe and Salinas to OFP management. In addition, Lathan alleges that he complained about "racial words, racial actions." It is also undisputed that Lathan was terminated from his job in September 2002. Lathan alleges that he was terminated because of his complaints of racial animus and disparate treatment by management.

To satisfy the third element, Lathan must show a causal link existed between the protected action and the adverse action. Under Ninth Circuit law, "[c]ausation sufficient to establish a *prima facie* case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory [adverse employment action]." <u>Miller v. Fairchild Indus., Inc.</u>, 797 F.2d 727, 731 (9th Cir. 1986). Additionally,

the courts will also look to the "attending circumstances that
suggest something other than legitimate reasons for the temporal
tie." <u>Portland Ass'n of Teachers v. Multnomah Sch. Dist. No. 1</u>,
171 Or.App. 616, 16 P.3d 1189, 1197 (2000).  These attending
circumstances may include inconsistent application of policies or
any other circumstances that suggest the employer had a
retaliatory motive.  <u>Coszalter v. City of Salem</u>, 320 F.3d 968,
977-978 (9th Cir. 2003).

Viewing the evidence in the light most favorable to Lathan,
there is some evidence in the record that Lathan and other
African American employees where required to keep working when
the line shut down while non-minority employees would take a
break; Lathan was suspended for three days for being "absent
without notice" despite having called in;[4] and Lathan was
terminated one month after the allegedly wrongful suspension.

Based on the foregoing, the court finds that Lathan has
presented some evidence to demonstrate a causal link between his
protected activity and the adverse actions taken against him as
required to state a *prima facie* claim of retaliation for
complaining about race discrimination under Title VII and section
1981.  Thus, Lathan has satisfied the third and final element of
his *prima facie* case for retaliation.

---

[4]     From the record, it appears there is a legitimate
dispute between OFP and Lathan regarding whether Lathan's three-
day suspension was justified under OFP's point system.  However,
at this stage the court must view this evidence in the light most
favorable to Lathan.

**B.    Legitimate Non-Discriminatory Reason**

   1.   Legal Standard

Once the complainant has made a *prima facie* showing of
retaliation, the burden shifts to the employer to articulate a
legitimate, non-discriminatory reason for the employment action.
See, e.g., Rivera v. Tressource Indus., Inc., 2005 WL 608265
(D.Or. 2005)(citing Wallis v. J.R. Simplot, 26 F.3d 885, 889 (9th
Cir. 1994)).   To "articulate" a legitimate reason for an
employment decision does not mean to express an argument; it
meant to produce evidence.   Rodriquez v. GMC, 904 F.2d 531, 533
(9th Cir. 1990)

   2.   Analysis

OFP asserts that there were legitimate, non-discriminatory
reasons and a lack of differential treatment for the termination.
Specifically, OFP maintains that Lathan's termination was
reasonable and justified.   OFP offers the following undisputed
evidence:

> A few months after he was hired, management met with Lathan
> to discuss his work performance, after two performance
> reviews had demonstrated that Lathan was making significant
> performance errors.   Lathan acknowledged that he needed
> additional computer training, and in response Abernathy
> assigned another employee to provided Lathan one-on-one
> computer training for one week.   Lathan also acknowledged to
> Nowlen that Lathan was having difficulty performing his job.
> Kugler repeatedly pressured Abernathy to terminate Lathan
> due to his poor work performance, but Abernathy tried
> instead to improve Lathan's performance.

Lathan does not dispute that his computer skills were deficient and that he needed to improve them in order to keep his job.  Indeed, during his deposition, Lathan testified as follows:

Q.    . . . .  Isn't it true that you had a meeting with Paul Abernathy, Joe Rachal and Steve Kugler where they said, "You have to take computer training if you're going to keep you job here"?

A.    Right, yes.

Q.    That's correct?

A.    Yeah, I remember that.

      . . . .

Q.    And you showed up for one day of the training at PCC, didn't you?

A.    Correct.

Q.    But then you didn't go back for another class; is that correct?

A.    Correct.

Q.    Do you recall having a one-on-one meeting with Joe Rachal after you talked to Paul Abernathy and Steve Kugler and Joe Rachal and Joe Rachal saying to you, "if you don't finish that computer course, you're going to get fired"?

A.    Yes, I remember that.

Q.    And Joe Rachal participated in this meeting because he was an elected representative of the employee committee, correct?

A.    Correct.


Q.    And did you tell Mr. Rachal, "I get it, I understand that"?

A.    Yes, I did.

. . . .

Q.    So on September 10, 2002, do you recall meeting with
      Joe Rachal, Rick Lampe, and Mr. Abernathy to talk about
      your termination?

A.    Yes, I do.

Q.    And this document is authored by Abernathy and says, "I
      informed Mr. Lathan in early June that, due to his
      inadequacies at entering production in the computer, he
      would be required to take a computer data entry course
      to be able to stay employed." That's correct, right.?

A.    Correct, correct.

      . . . .

Q.    So prior to September 10th, you had told Mr. Kugler and
      Mr. Lampe that school was going good?

A.    Correct.

Q.    Okay. This is an email from Sue Dodge at PCC on
      September 5th, 3003, saying . . . . Harold Lathan came
      in on June 24th and was in the lab from 5:20 to 6:40.
      We have no record of him returning to the lab." Is
      that an accurate statement of the amount of time that
      you had spent in the self-paced training lab at
      Portland Community College as of September 5, 2002?

A.    That's a very accurate statement. And she also told me
      that this is a self-paced class, you can study at home,
      you don't have to be here, you just come here to take
      the test. We were working 10 hours a day; it was
      summertime. I transferred to PCC Cascade to continue
      the test, but it did not start until a later date. **I
      did not communicate that, and I guess that's why I was
      fired.** (Emphasis added).

Q.    I understand you can study at home, but you have to
      actually do the self-paced training in the lab, and you
      had only gone to the lab on one occasion, correct?

A.    Correct.

The court finds that OFP has set forth a legitimate non-

discriminatory reason for terminating Lathan's employment.

Lathan concedes that: (1) due to data entry deficiencies on the job, his continued employment was conditioned upon his completion of computer training; (2) he did not complete the training; and (3) prior to his termination he did not communicate to OFP his intent to complete the training at a later date. Even assuming that Lathan communicated such an intent, which the record does not show, it was reasonable for OFP to terminate him. Three months had lapsed between the time OFP informed him of the requirement that he complete the class and the date of his termination. The most that Lathan could offer on the date of his termination was an intent to complete the class at some future juncture. OFP was not required to wait indefinitely. OFP has articulated a legitimate non-discriminatory explanation for Lathan's termination.

### C. Pretext

#### 1. <u>Legal Standard</u>

If the employer is able to articulate a legitimate non-discriminatory reason for the adverse employment action, the complainant bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. <u>Ray</u>, 217 F.3d at 1240. "[P]laintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

employer." <u>Chuang v. Univ. of Cal. Davis</u>, 225 F.3d 1115, 1127 (9th Cir. 2000).

2.  <u>Analysis</u>

Lathan is unable to refute OFP's legitimate reason for the termination.  In fact, Lathan does not offer any evidence or allege any facts to demonstrate that OFP's reason for terminating him was simply a pretext for a discriminatory motive.  Indeed, in his deposition, Lathan admitted that he was fired because he failed to communicate to OFP his intent to complete the computer class at a later date and different location.  Lathan has offered no evidence to refute this legitimate reason.  Rather, Lathan simply sets forth bare allegations:

> The reasons for termination are a pretext.  A reasonable jury could easily find that Abernathy got rid of Lathan because of his complaints, the kind of complaints that Abernathy did not to want to 'get back to him', rather than the fact that Lathan had not completed a self-paced computer course.

This "evidence" offered by Lathan is simply vague and conclusory allegations that are insufficient to defeat a summary judgment motion.  <u>See</u>, <u>e.g.</u>, <u>Bradley v. Harcourt, Brace & Co.</u>, 104 F.3d 267, 270 (9th Cir.1996)(To defeat summary judgment, a nonmoving party must respond with something more than conclusory allegations or speculation.).  The court is aware that Lathan's burden to show pretext is not a heavy one, but certainly something in response OFP's evidence is needed.  In fact, to avoid summary judgment, Lathan is obligated to show that there is a genuine issue of material fact as to whether OFP's articulated

legitimate, non-discriminatory reason was pretextual.  <u>See</u>
<u>Wallis</u>, 26 F.3d at 890.

OFP proffered a legitimate, non-discriminatory reason for
terminating employment –– Lathan's failure to complete a required
computer training course –– and Lathan failed to produce specific
and substantial evidence that the stated reason was pretext for
discrimination.  <u>See</u> <u>Aragon v. Republic Silver State Disposal</u>
<u>Inc.</u>, 292 F.3d 654, 658-59 (9th Cir. 2002).  Lathan does not
offer any direct evidence that his termination may have been
racially motivated.  Nor has Lathan demonstrated that the
articulated non-discriminatory reason could be a pretext for
racial discrimination.  Rather, Lathan simply restates his
contention that he must have been fired because he had complained
of racial animus and disparate treatment of African Americans,
despite his admission that he was required to complete a computer
training course and he failed to do so.  Lathan failed to present
any disputed issue of fact that could support a rational
inference that OFP engaged in intentional discrimination when
they terminated him in September 2002.  Summary judgment is
granted against Lathan's claim for retaliation under Title VII
and section 1981.

## II.  Hostile Work Environment - Harassment

### A.  *Prima Facie* Case

#### 1.  Legal Standard

To establish a *prima facie* hostile work environment claim under either Title VII or section 1981, an employee must raise a triable issue of fact as to whether: (1) he was subjected to verbal or physical conduct because of his race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter conditions of his employment and create an abusive work environment.  Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998).  To survive summary judgment, Nowlen and Lathan must show a disputed question of material fact regarding whether (1) a reasonable African American man would find the workplace so objectively and subjectively racially hostile as to create an abusive working environment; and (2) OFP failed to take adequate remedial and disciplinary action.  Steiner v. Showboat Operating Co., 25 F.3d 1459, 1462-1463 (9th Cir. 1994); see also Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  Courts should consider:  the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance.  Harris v. Forklift Systems, 510 U.S. 17, 23 (1993).

2. <u>Analysis</u>

As a threshold matter, OFP contends that any hostile work environment claim can only be founded on coworker conduct. OFP asserts that Nowlen and Lathan's only allegation of any remark by an OFP manager concerning race is a single inappropriate comment by supervisor Lampe in the lunchroom during the early part of Lathan's employment.[5] Lathan concedes that Abernathy took action when he reported the comment, and the conduct was never repeated.

The court agrees. Although Lampe's comment was crass, it was isolated and insufficient to establish a hostile work environment. A single isolated remark is insufficient to constitute "severe or pervasive" harassment. The record does not reveal any other racial or prejudicial remarks by an OFP supervisor. Thus, the court will consider Nowlen's and Lathan's claims of a hostile work environment based only on the conduct of their coworkers.

OFP challenges Nowlen's and Lathan's hostile work environment claims primarily on two grounds, namely, they have failed to show that the conduct was "severe and pervasive" and,

---

[5]     It is undisputed that:

> Neither plaintiff alleges than any OFP manager engaged in inappropriate behavior, with the exception of a single comment concerning race that was made to Lathan by a supervisor, Rick Lampe. After Lathan reported the concern to Abernathy, the general manager, Abernathy addressed the issue and Lampe never made any other comment to Lathan that Lathan viewed as inappropriate of offensive.

in any event, OFP responded appropriately in each instance, *i.e.*, in a way reasonably designed to address the allegations.

Considering the facts in the light most favorable to Nowlen and Lathan, the record reveals evidence of harassment directed at Nowlen and Lathan. While OFP disputes Nowlen and Lathan's version of the facts, disputes about material facts and credibility determinations must be resolved at trial. <u>See</u>, <u>e.g.</u>, <u>McGinest</u>, 360 F.3d at 1115. There is some evidence presented that:

- Nowlen and Lathan were subjected to racial slurs by coworkers, including "nigger," "black nigger," "dirty black nigger," "dirty black dick," " big black coon, " "boy," "drug dealer," "buckwheat," "coon," "black ass," "kunta kinte";

- A hangman's noose hung at a job station, and on at least one occasion, a white coworker pointed to the noose and pointed to Lathan;

- Nowlen, Lathan and other African American workers were required to work when the production line broke down; conversely, Caucasian workers would take a break;

- African American workers were disciplined for the same conduct for which white workers received no discipline or less discipline.

For purposes of summary judgment, Nowlen and Lathan have provided sufficient evidence to demonstrate that they were subjected to a hostile work environment. They have presented evidence that over a 15-month period numerous racial incidents occurred, ranging in severity from being called racially derogatory names to experiencing symbols of violence, inequality, slavery and racism. In addition, there is evidence that African American workers were required to work while non-minorities would

rest; and African American workers were held to a higher standard of conduct than their non-minority counterparts.  Based on the foregoing, Nowlen and Lathan have raised a question of material fact with regard to the existence of a racially hostile workplace at OFP.

Once the court concludes, for purposes of summary judgment, that Nowlen and Lathan have suffered a hostile work environment, it must next consider whether OFP is liable for the harassment. As set forth below, OFP is liable for the conduct of Nowlen and Lathan's coworkers if Nowlen and Lathan are able to show that OFP had knowledge of the harassment and failed to take adequate measures to deal with it.

**B.    Employer's Response**

1.    Legal Standard - Coworkers

"[E]mployers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." Ellison v. Brady, 924 F.2d 872, 881 (9th Cir. 1991) (quotations omitted); accord Swinton v. Potomac Corp., 270 F.3d 794, 803 (9th Cir. 2001).  To avoid liability for such harassment the employer must undertake remedial measures "reasonably calculated to end the harassment." Harris, 510 U.S. at 22; accord Ellison, 924 F.2d at 882.

The reasonableness of the remedy depends on its ability to: (1) stop the harassment by the person who engaged in the

harassment; and (2) persuade potential harassers to refrain from
unlawful conduct. <u>McGinest</u>, 360 F.3d at 1120 (quotations and
citations omitted). Additionally, the employer must intervene
promptly and the remedial measures must include some form of
disciplinary action that is proportionate to the seriousness of
the offense. <u>Id</u>.

   2. <u>Analysis</u>

   OFP explains that, other than Lampe's comment, Nowlen and
Lathan reported only two other instances of racial animus.
Specifically, (1) a comment by coworker Jones to McRae; and (2) a
comment by Salinas to Lathan. OFP insists that its response to
those two comments was adequate to stop the harassment. OFP
maintains that Nowlen and Lathan have failed their burden to
prove that OFP had knowledge of other racial harassment.
Accordingly, OFP seeks summary judgment on the ground it took
appropriate remedial action to stop the harassment that had been
reported directly by Nowlen and Lathan.

   As OFP is aware, the standard for an employer's liability
based on coworker conduct includes conduct that the employer
"should have known". Here, there is evidence that OFP likely had
knowledge of other instances of harassment. For example, Nowlen
testified in his deposition that a noose was hanging in a place
where it could easily be seen by all. Indeed, Nolwen testified
that: "The most pinnacle thing is the noose. Everybody seen
that noose. Everybody seen that. It's right there on the

stacker. What's that symbolize." Certainly, OFP would have imputed knowledge of a noose hanging in plain view in its facility. <u>See</u>, <u>e.g.</u>, <u>McGinest</u>, 360 F.3d at 1120.

In addition, there is evidence that OFP discouraged direct reports of workplace harassment. For example, Lathan testified in his deposition that Abernathy told him that he did not want to be involved with workplace problems. Specifically, Lathan testified that:

> There was a situation and a time when I believe I went to Paul and told him how I was being treated and felt down there, and Paul said to me that **"You have to speak up, take care of yourself, I don't want to get involved, I don't want to be a part of that."** (Emphasis added.).

Similarly, Nowlen testified that he was told by Troy Jones that: "Paul told me this, Paul told me that, Paul told me if I had a problem with you guys to take it outside. Just don't let it get back to him and everything will be all right."

There is also evidence that OFP management was aware of the practice that allowed non-minority workers to take a break when the production line broke down, but required that African American workers continue to work. Bryant stated in his affidavit that on one occasion he approached Kugler and said: "'Is this really as bad as it looks? Why is it very time I come over here and the line is down, the brothers are all working and the whites are all sitting around on their []?', or words to that effect."

Finally, OFP does not deny that management had no knowledge of other instances of harassment. Rather, OFP argues only that Nowlen and Lathan have failed in their burden of showing that management had actual knowledge.

The court finds that OFP had actual knowledge of the events of which Nowlen and Lathan informed their immediate supervisor or manager, including the offensive comments by coworkers Salinas and Jones. Additionally, OFP had either actual or imputed knowledge regarding other harassment such as the noose and the requirement that blacks work while whites rest. Moreover, there are fact questions about whether OFP reasonably should have know about other racial animus, given the pervasive nature of the harassment, and some evidence that at least Abernathy discouraged direct reporting of a hostile workplace.

Nowlen and Lathan have provided evidence of the manner in which they were harassed and disfavored in relation to non-minority employees. The court finds that disputed issues of fact exist as to whether a reasonable African American would find OFP's workplace so subjectively and objectively hostile as to create an abusive working environment. Accordingly, summary judgment against Nowlen's and Lathan's claims for hostile work environment is denied.[6]

---

[6] Other than the three incidents that were reported directly by Nowlen and Lathan, OFP offers no evidence of remedial action for the harassment. As such, they are not entitled to

(continued...)

**III. Count Three - Intentional Infliction of Emotional Distress**

To succeed on a claim for IIED, plaintiff must show that: (1) defendant intended to inflict severe emotional distress on the plaintiff; (2) defendant's acts did in fact cause the plaintiff to suffer severe emotional distress; and (3) defendant's acts consisted of "some extraordinary transgression of the bounds of socially tolerable conduct." Lewis v. Oregon Beauty Supply Co., 302 Or. 616, 733 P.2d 430, 436 (1987).

Regarding the intent requirement for an IIED claim, the Oregon Supreme Court has stated that while there is no "purpose" requirement, there must be evidence that the person acted out of a desire to inflict emotional distress. McGanty v. Staudenraus, 321 Or. 532, 550, 901 P.2d 841, 852 (1995). Adopting the Restatement of Torts definition, the Court explained: "The word 'intent' is used throughout the Restatement of [Torts] to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Id.

Regarding whether conduct rises to the level of "an extraordinary transgression of the bounds of socially tolerable conduct," the Oregon Supreme Court has held that conduct that is merely "rude, boorish, tyrannical, churlish and mean" does not satisfy the high standard that defendant's acts must constitute

---

[6](...continued)
summary judgment on that ground.

an extraordinary transgression of the bounds of socially
tolerable conduct.  Patton v. J.C. Penney Co., 301 Or. 117, 124,
719 P.2d 854, 858 (1986), abrogated on other grounds by McGanty,
321 Or 532, 901 P.2d 841.  The court has stated that IIED "does
not provide recovery for the kind of temporary annoyance or
injured feelings that can result from friction and rudeness among
people in day-to-day life even when the intentional conduct
causing plaintiff's distress otherwise qualifies for liability."
Hall v. The May Dep't Stores Co., 292 Or. 131, 135, 637 P.2d 126,
129 (1981), abrogated on other grounds by McGanty, 321 Or 532,
901 P.2d 841. "A discharge from employment, without more, d[oes]
not amount to an extraordinary transgression of the bounds of
socially tolerable conduct." McGanty, 321 Or. at 549.

   While IIED claims are common in the context of employment
disputes, Oregon appellate courts have been very hesitant to
impose liability for IIED claims in employment settings, even in
the face of serious employer misconduct.  Madani v. Kendall Ford
Co., 312 Or. 198, 205-06, 818 P.2d 930, 934 (1991), abrogated on
other grounds by McGanty, 321 Or. 532, 901 P.2d 841; Lewis, 302
Or 616, 733 P.2d 430.  The Oregon appellate court has stated that
socially intolerable conduct is that which is "outrageous in the
extreme."  See Watte v. Edgar Maeyens, 112 Or.App. 234, 239, 828
P.2d 479 (1992).

   Based on the record as a whole, Nowlen and Lathan allege the
following in support of their claim that they endured some

extraordinary transgression of the bounds of socially tolerable conduct while employed by OFP:

- Nowlen and Lathan were subjected to racial slurs by coworkers, including "nigger," "black nigger," "dirty black nigger," "dirty black dick," " big black coon, " "boy," "drug dealer," "buckwheat," "coon," "black ass," "my kunta kinte";

- A hangman's noose hung at a job station, and on at least one occasion, a white coworker pointed to the noose and pointed to Lathan;

- Nowlen, Lathan and other African American workers were required to work when the production line broke down; conversely, Caucasian workers would take a break;

- African American workers were disciplined for the same conduct for which white workers received no discipline or less discipline;

- Abernathy struck Lathan in the head with a clipboard after Lathan because he was angry about a "work-related" issue.

Most all of these allegations are clearly race-related and egregious. Additionally, the conduct complained of here includes actions by coworkers and OFP management. Reasonable people could differ on whether OFP's actions over a 15-month period that (as mentioned above) included numerous racial incidents ranging in severity from being called racially derogatory names to experiencing symbols of violence, inequality, slavery and racism; requiring African American workers to work while non-minorities would rest; and holding African American workers to a higher standard of conduct than their non-minority counterparts is outrageous conduct. Summary judgment against Nowlen's and Lathan's claims for IIED is denied.

**CONCLUSION**

Based on the foregoing, OFP's Motion for Summary Judgment (doc. #37) is GRANTED, in part, and DENIED, in part.

IT IS SO ORDERED

DATED this __13__ day of July, 2005.


        __/s/Donald C. Ashmanskas__
         DONALD C. ASHMANSKAS
       United States Magistrate Judge